J-S20002-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 97 EDA 2023 |

Appeal from the Order Entered December 8, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000697-2017

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 98 EDA 2023 |

Appeal from the Decree Entered December 8, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000670-2021

BEFORE:   DUBOW, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED AUGUST 1, 2023**

J.W. ("Father") appeals from the December 8, 2022 decree of the trial court, which terminated Father's parental rights to his son, J.L.W. ("Child"), born in January 2011.  Father also appeals from a December 8, 2022 trial court order that changed the permanent placement goal for Child from

_____

[*] Retired Senior Judge assigned to the Superior Court.

reunification to adoption. After careful review, we affirm the termination of Father's parental rights and dismiss Father's appeal of the goal change order as moot.

Child initially came to the attention of DHS in March 2017 when he was removed from the home of his mother, E.W. ("Mother"), and declared dependent based upon reports concerning Mother's mental health. Father did not live with Mother or Child at the time of the 2017 removal or in any other period relevant to this appeal. Child was reunified with Mother in July 2018, and DHS supervision terminated the following month.

DHS again received reports in the spring of 2019 related to the mental health of Mother and Child. Child was removed from the home in May 2019, and placed in a medical facility. On June 11, 2019, Child was adjudicated dependent based upon lack of proper parental care or control and placed in treatment foster care, having been discharged from the medical facility. In mid-2020, Child was placed in kinship foster care with a maternal great-aunt. Permanency review hearings were held on August 14, 2019, November 6, 2019, January 29, 2020, September 11, 2020, February 4, 2021, August 17, 2021, November 17, 2021, July 13, 2022, and October 26, 2022. Father only attended the January 29, 2020 hearing.

On November 5, 2021, DHS filed a petition to involuntarily terminate the parental rights of Father and Mother and a petition to change Child's permanency goal to adoption. A hearing was held on the petitions on

December 8, 2022.[1]  At the hearing, Unique Dutton-Bass, the current case manager from the assigned Community Umbrella Agency ("CUA"), testified that DHS removed Child in 2019 following receipt of a general protective services report that Mother had held a gun to Child's older sibling's head and other erratic behavior.  N.T., 12/8/22, at 17-19.  The agency also had concerns regarding Mother's ability to address Child's mental health needs.  *Id.* at 19.

Dutton-Bass testified that, after DHS took custody of Child in May 2019, case plan objectives were established for Mother and Father.  *Id.* at 20, 25. With respect to Father, these objectives included parenting classes, mental health treatment, enrollment in an anger management program, providing proof of housing and employment, and supervised visits with Child.  *Id.* at 20, 25, 43, 46.  Dutton-Bass explained that since she was assigned the case in June 2022, she has had no communication with Father, that none of the certified letters that were sent to Father once or twice per month were returned to CUA, and that he had never expressed interest in visits with Child.

---

[1] Child was represented by a guardian *ad litem* and separate legal counsel at the hearing.  *See In re Adoption of K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) (holding that "appellate courts should engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S. § 2313(a)).  The guardian *ad litem* has filed a brief in this appeal advocating for the affirmance of the termination decree and goal change order.

*Id.* at 26, 36-37.  When asked to describe Father's level of compliance with his case objectives, Dutton-Bass described it as "[n]one." *Id.* at 26.

When asked whether termination of Father's parental rights would cause Child irreparable harm, Dutton-Bass answered in the negative. *Id.* at 29-30. She explained that Child had not seen Father "in some time" and that Child does not ask to visit with Father. *Id.*  As a result of the fact that she had not observed any visits between Father and Child, Dutton-Bass had not detected a bond between the two. *Id.* at 30.  Dutton-Bass also stated that reunification of Child with Father was not appropriate and adoption was in Child's best interests because Father had not completed any of his case objectives. *Id.*

Dutton-Bass stated that Child was doing well in foster care with his great-aunt, that his behaviors had evened out and he was no longer in mental health treatment, he was on the honor roll in school, and he was up to date on all of his medical treatment with no current prescribed medication. *Id.* at 28-29, 31-32.  Dutton-Bass also testified that Child understands the concept of adoption and wished to be adopted. *Id.* at 31.

Ronara Jones, the CUA case manager from 2018 until Dutton-Bass took over in June 2022, testified that she visited Father's residence, a rented bedroom at a rooming house, and it was not appropriate for Child. *Id.* at 39, 46.  Jones stated that Father started but did not complete anger management classes. *Id.* at 46, 56, 60.  Father was not able to attend the required mental health treatment based upon an issue with his insurance. *Id.* at 46, 55-56,

60-61. Father also never completed the required parenting classes. *Id.* at 61.

Father initially had once-per-week supervised visits with Child that were increased to twice-weekly visits based upon his compliance with the agency's directives. *Id.* at 47, 58. Jones stated that the visits were "somewhat good" but that Child was not always comfortable with the interactions with Father because on occasion Father yelled at Child if he did not know a word when reading a book aloud. *Id.* at 47. Jones observed Child crying on one occasion because of these interactions. *Id.* at 47. Jones also described Child as being "bored" during the visits. *Id.* at 59. Jones testified that Father kept in good touch with her while the visits were ongoing. *Id.* at 60.

Jones explained that the supervised visits ceased at the outset of the Covid-19 pandemic in March 2020 as Father did not want to engage in virtual visits, even though he had the capability to do so. *Id.* at 48, 51, 55-56. Jones recalled that Father stated at the time that "he didn't want to see his son through a phone." *Id.* at 57. Jones spoke with Father on one occasion after in-person visits resumed and Father indicated that he wished to resume visitation, but Child refused at that time. *Id.* at 59-60, 62. Jones testified that Child did not exhibit any negative behavior as a result of the cessation of visits or ask to see Father after that point even though Jones regularly asked Child about whether he would like to resume visits with Father. *Id.* at 51-52, 60.

- 5 -

Jones stated that Father's compliance with case objectives during her time as case manager was "[m]inimal." *Id.* at 48. Jones opined that Child would not suffer irreparable harm if the Father's parental rights were terminated. *Id.* She stated that, although there had been a bond in the past, Father did not have a parent-child bond with Child at the time of the hearing. *Id.* at 57, 59, 61-62. Jones further opined that adoption was in Child's best interest. *Id.* at 48. Jones testified that, after his placement with his great-aunt, he had made a "huge turnaround," was achieving honor roll grades in school, and his behavioral issues had dissipated. *Id.* at 50-51.

Child's legal interests counsel stated at the hearing that she spoke with Child, who was nearly 12 at that time; Child stated to counsel that he fully understood what adoption meant and that he desired to be adopted by his great-aunt. *Id.* at 62. Child indicated that he did not want to have any more of a "connection" or "contact" with Mother and Father going forward. *Id.* at 62-63. Child also recognized that his great-aunt is who is providing for him and supports him, and he was proud of how well he was doing in school and emotionally compared to his condition when removed from Mother's home. *Id.*

Father also testified at the hearing.[2] When asked about his bond with Child, Father stated that he had not seen his son since March 2020 but that

---

[2] Mother, who arrived late to the hearing and left early after causing several disruptions, did not testify. *See* N.T., 12/8/22, at 43-49.

"[w]hen we had a bond together[,] I missed him, and he missed me." *Id.* at 63-64. Father testified that he was working hard to reunite with Child but that he had to stop his mental health treatment, which he was attending until October 2020, "because [he] was going through a whole lot." *Id.* at 64-65. Father stated that he was also attending anger management but he "just stopped." *Id.* at 65. Father also indicated that he was still living in the same rooming house and had not made attempts to find new housing because he "like[s] where [he's] at." *Id.* at 69.

Father attributed his inability to fulfill his case objectives to three reasons. *Id.* at 64-66. First, he stated that he had to be with his father, who is "old and [] sick," every day. *Id.* at 64. Second, he stated he was "going through a lot of stuff with [his other] son and [that] son's mother [that kept him] going back and forth to court." *Id.* at 65. And, finally, he stated that the Covid-19 pandemic "slowed everything down." *Id.* at 66.

Father stated that he had a very good relationship with Jones, the case manager from 2018 to June 2022. *Id.* at 66. He testified that he did not refuse virtual visits because he did not want to talk to his son through a phone, as reported by Jones. *Id.* at 70. Instead, Father stated that he attempted to stay in touch with Jones and the other case workers but that no one would answer or return his calls. *Id.* at 70.

Father testified that he appeared at court hearings up until the beginning of the pandemic but ceased going at that point as he stopped receiving subpoenas directing him to attend. *Id.* at 73-74. He testified that he was

- 7 -

nevertheless aware that hearings were taking place at three-month intervals, but he was not sure of the exact date and time of the hearings. *Id.* at 72-73. While Father stated that he attended a hearing that occurred in September 2021,[3] he did not request visitation at that hearing. *Id.* at 66, 74. Father testified that since that September 2021 hearing, he did not "hear [any]thing about [his] son from 2021 until now," he had not received any subpoenas until shortly before the December 8, 2022 hearing, and he was unaware that Child was living with his great-aunt until one month prior to the hearing. *Id.* at 64, 66.

At the conclusion of the December 8, 2022 hearing, the trial court announced its ruling that the involuntary termination petitions and goal change petition would be granted. *Id.* at 75-78. On that same date, the trial court issued separate decrees terminating the parental rights of Father and Mother and entered an order changing Child's permanency goal to adoption. With respect to Father, the termination decree provided that termination was proper under Section 2511(a)(1), (2), (5), and (8) of the Adoption Act, as well as under subsection (b) of that same provision. 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), (b). Father filed timely notices of appeal from the decree terminating his parental rights and the goal change order,[4] along with contemporaneous

_____

[3] Notably, no hearing took place in September 2021.

[4] Mother did not appeal the goal change order or the termination decree as to her.

concise statements of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).[5]

Father presents the following issues on appeal:

1. Did the trial court err as a matter of law or abuse[] its discretion where it determined that the requirements of 23 Pa.C.S.[ §] 2511(a) to terminate [Father]'s parental rights were met.

2. Did the trial court err as a matter of law or abuse[] its discretion where it determined that the requirements of 23 Pa.C.S.[ §] 2511(b) were met.

3. Did the trial court err as a matter of law or abuse[] its discretion where it determined that the permanency goal for [Child] should be changed to adoption.

Father's Brief at 3 (suggested answers omitted).

Father's first two issues concern the trial court's involuntary termination of his parental rights to Child. In addressing these issues, we apply the following precepts:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

_____

[5] On February 6, 2023, the trial court informed this Court by letter that, due to the retirement of the trial court judge who had presided over these proceedings, no Pa.R.A.P. 1925(a) opinion would be prepared.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the trial court determines the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *T.S.M.*, 71 A.3d at 267.

Here, the trial court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (8), and subsection (b). However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004)

(*en banc*). We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>    \*     \*     \*
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>    \*     \*     \*
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." ***In re Adoption of L.A.K.***, 265 A.3d 580, 600 (Pa. 2021). The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct, but also include refusal and parental incapacity that

- 11 -

cannot be remedied. *In re K.M.W.*, 238 A.3d 465, 474 (Pa. Super. 2020) (*en banc*). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021); *see also In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*), *affirmed*, 240 A.3d 1218 (Pa. 2020) (noting that a parent has an "affirmative duty" to work towards the return of his children, which requires, at a minimum, that he "cooperate with the [local agency] and complete the rehabilitative services necessary so that the parent can perform his parental duties and responsibilities"). "[W]hen a parent has demonstrated a continued inability to conduct his life . . . in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citation omitted).

The trial court found that grounds for termination existed under Section 2511(a)(2) based upon Father's failure to maintain a relationship with Child over the more-than-two-year period since the beginning of the Covid-19 pandemic and the cessation of his visits with Child. N.T., 12/8/22, at 75-76. The court found Father's testimony to be non-credible, specifically finding Father's claim that he did not see Child over this extended period because "somebody else didn't do what they were supposed to do" as being unsupported by the record. *Id.* The court found that the testimony presented

by DHS contradicted Father's explanations as to why he could not comply with his case objectives, showing that "he never did anything to try and maintain a relationship" with Child. *Id.* at 76. The court further emphasized the three-and-one-half-year period in which Child had spent in DHS's care without essential care from either of his parents. *Id.* at 76-77.

Father argues that "it was DHS's burden to prove that Father lacked the capacity to parent" Child, and that "there was no evidence at all in the record to support a finding that Father had any incapacity at all." Father's Brief at 13-14. In light of this absence of any evidence of Father's incapacity, Father contends that we should vacate the termination decree. *Id.* at 14.

Upon review, we conclude that the record supports the finding that termination was appropriate under Section 2511(a)(2). We first find no merit to Father's argument that the trial court was required to prove his incapacity to parent Child. Rather, the language of Section 2511(a)(2) is in the disjunctive and requires a showing of "repeated and continued incapacity, abuse, neglect **or** refusal of the parent [that] has caused the child to be without essential parental care, control or subsistence." 23 Pa.C.S. § 2511(a)(2) (emphasis added). Therefore, the agency is required to prove any one of the parent's incapacity, abuse, neglect, or refusal and not incapacity specifically. *See id.*; *see also K.M.W.*, 238 A.3d at 474 (stating that termination under Section 2511(a)(2) can be based on either affirmative misconduct, refusal, or neglect).

Here, the evidence related to Father may be more properly deemed as showing his repeated and continued refusal to provide Child with essential parental care. The CUA established case objectives for Father—including parenting and anger management classes, seeking mental health treatment, obtaining employment and adequate housing, and participating in supervised visits with Child—yet Father was only deemed to be minimally compliant with these objectives during the early stages of Child's dependency and not at all compliant by the time of the termination hearing. N.T., 12/8/22, at 20, 25, 43, 46, 48. Father did not complete the parenting or anger management classes, he has not fulfilled the requirement that he obtain mental health treatment,[6] and he has made no efforts to obtain adequate housing. *Id.* at 39, 46, 55-56, 60-61, 64-65, 69.[7]

While Father was initially compliant in attending supervised visits and his visitation schedule even being increased to twice per week, his visits ceased in March 2020 when they went virtual, which Father found to be unsatisfactory. *Id.* at 47-48, 51, 55-58. While Father requested on one occasion to resume visitation after in-person visits restarted, which Child

---

[6] While the testimony from the CUA witnesses indicated that Father's inability to fulfill the mental health objective related to an insurance issue, N.T., 12/8/22, at 46, 55-56, 60-61, Father testified that he voluntarily ceased attending mental health appointments in October 2020 "because [he] was going through a whole lot." *Id.* at 64-65.

[7] The record contains no evidence regarding whether Father complied with the case objective to obtain adequate employment.

refused, Father admitted that he never made such a request in court, nor did he even attend any hearings after the date that in-person visits resumed. *Id.* at 59-60, 62, 66, 74.

Father also refused to reestablish parental care to Child by failing to remain in contact with CUA as the period of Child's dependency progressed. While Jones stated that she was regularly in contact with Father while he was still visiting with Child, she only spoke to him on one occasion after in-person visits resumed despite the CUA's numerous attempts to reach out to Father via cellphone and letters. *Id.* at 58-60. Furthermore, Dutton-Bass, who managed the case during the six months preceding the hearing, stated that she had never heard from Father despite the fact that letters were sent to him once or twice per month that were never returned as undeliverable. *Id.* at 26, 36-37. As discussed above, Father also failed to attend eight of the nine permanency review hearings, and he was completely unaware of Child's living situation at the hearing, with no knowledge that Child was residing with his maternal great-aunt for more than two years after Child's placement in kinship care. *Id.* at 64.

Turning to the second element under Section 2511(a)(2), Father's refusal to parent Child caused Child "to be without essential parental care, control or subsistence necessary for his physical or mental well-being." 23 Pa.C.S. § 2511(a)(2); *see also L.A.K.*, 265 A.3d at 600. Child was declared dependent on June 11, 2019 after his removal from Mother's home, and he remained either in medical treatment, foster homes, or in kinship care with

his great-aunt for approximately three-and-one-half years until the date of issuance of the termination decrees and goal change order.

Finally, the evidence showed that the causes of Father's refusal to provide essential parental care to Child "cannot or will not be remedied by" Father. 23 Pa.C.S. § 2511(a)(2); *L.A.K.*, 265 A.3d at 600. Although Father started off with good attendance at his supervised visits and was otherwise minimally compliant with his case objectives, after the onset of the Covid-19 pandemic he did not attend any more visits or court hearings, almost entirely ceased communication with the CUA case managers, and made no efforts to complete the anger management, parenting, or mental health objectives. Father's inability to remedy the issues that prevent him from providing care to Child is exemplified by Father's statement that he has not sought to move out of his inadequate housing, a rented room at a boarding house, because he "like[s] where [he's] at." N.T., 12/8/22, at 39, 46, 69. We additionally note that the excuses Father offered at the hearing for why he could not comply with his case objectives, his own father's infirmed state, the legal issues with the mother of another one of his children, and the "slow[] down" associated with the pandemic, *id.* at 64-66, provides no cause to believe that Father would prioritize his relationship with Child in the future. *See Z.P.*, 994 A.2d at 1118 ("[A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous.") (citation omitted); *see also K.M.G.*, 219 A.3d at 672 (Section 2511 does not provide a parent with

an "unlimited period [of] time" to overcome their deficiencies in parenting that led to the adjudication of the child as dependent). We therefore conclude that DHS met its burden by clear and convincing evidence to show sufficient grounds for termination of Father's parental rights to Child pursuant to Section 2511(a)(2).

We next consider Father's second issue, which corresponds with the second prong of the termination analysis under Section 2511(b) of the Adoption Act. This provision requires that the trial court "give primary consideration to the development, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also In the Interest of K.T.**, ___ A.3d ___, 2023 WL 4092986, *14 (Pa. June 21, 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 2023 WL 4092986, *13. "[T]he determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis." **Id.** at *14; **see also L.A.K.**, 265 A.3d at 593.

Our Supreme Court has mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." **T.S.M.**, 71 A.3d at 267. Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the

benefit of moving the child toward a permanent home." *Id*. at 253. The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," such that the child could suffer "extreme emotional consequences" or "significant, irreparable harm." *K.T.*, 2023 WL 4092986, *16 (citation omitted). The court is not required to use expert testimony concerning the existence of a bond and may instead rely on the evaluations of case workers and social workers. *In the Matter of M.P.*, 204 A.3d 976, 983 (Pa. Super. 2019); *Z.P.*, 994 A.2d at 1121.

Our Supreme Court has instructed that a court engaging in a Subsection 2511(b) inquiry must also consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. *K.T.*, 2023 WL 4092986, *18. Nonetheless, there is no "exhaustive list" of factors that must be considered by a trial court in this context. *Id.* at *18 n.28. As under Section 2511(a), "the party seeking termination must prove by clear and convincing evidence that termination best serves the child's needs and welfare." *Id.* at *19 (citing *C.M.*, 255 A.3d at 358-59).

The trial court found that, while Father had a bond with Child during the period he was engaged in visitation more than two-and-one-half years prior to the termination hearing, that bond no longer existed at the time of the hearing. N.T., 12/8/22, at 75-76. The court noted that Child was currently

placed in a pre-adoptive home with a family that provided for his emotional and physical needs and that sought to care for him going forward. *Id.* at 76, 78. The court additionally placed great emphasis on Child's own expressed preference that he wanted no relationship with either of his birth parents in the future. *Id.* at 77.

Citing Jones' testimony that Father had a bond with Child when engaged in in-person visits in 2019 and 2020, *id.* at 59, 61-62, Father argues that the trial court erred by not "giv[ing] him more time to redevelop that bond once again and tak[ing] into account how well Father was doing before his in person visits were taken away due to" the Covid-19 pandemic. Father's Brief at 17.

We find no merit to Father's argument as it is not responsive to our analysis under Section 2511(b). Section 2511 provides for a bifurcated analysis, with subsection (a) centering on the conduct of the parent, "whereas the focus in Section 2511(b) is on the child." *In re C.B.*, 230 A.3d 341, 349 (Pa. Super. 2020) (citation omitted); *see also K.T.*, 2023 WL 4092986, *13, *19; *K.M.W.*, 238 A.3d at 473. Father's argument addresses only his own concerns as a parent and cites to his efforts to maintain contact with Child before the pandemic, with no attention paid to whether termination of Father's parental rights serves Child's needs and welfare. *K.T.*, 2023 WL 4092986, *13 ("Notably, [under Section 2511(b),] courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.").

Moreover, we conclude that the record supports the trial court's needs and welfare analysis, including the court's determination that there was no bond between Father and Child. It is well-established under Pennsylvania law that "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008); *see also A.H.*, 247 A.3d at 445. Jones, the CUA case manager through June 2022, testified that although Father and Child were bonded when visits were ongoing in 2019 and early 2020, no bond existed at the time of the December 8, 2022 hearing. N.T., 12/8/22, at 57, 59, 61-62. Jones explained that Child refused Father's request to resume in-person visits and never said he wanted to meet with Father when asked. *Id.* at 51-52, 59-60, 62. Dutton-Bass, who replaced Jones as case manager, also opined that there was no bond between Father and Child, and she stated that Child did not ask to have visits with Father. *Id.* at 29-30. Father also spoke about his bond in the past tense at the hearing, stating that "[w]hen [Child and I] **had** a bond together . . ." *Id.* at 64. Therefore, the evidence supports the trial court's conclusion that Child did not have a bond with Father.

In addition, the evidence shows that Child's emotional needs and welfare will be best served by termination of Father's parental rights to allow his adoption by his kinship foster family. Both Jones and Dutton-Bass opined that Child would not suffer irreparable harm if Father's parental rights were terminated and that adoption was in Child's best interests. *Id.* at 29-30, 48. The record reflects that Child's mental health had dramatically improved as

compared to his state when he was declared dependent and placed in in-patient treatment and then treatment foster care to address violent and disruptive behavior; after he began living with his great-aunt, Child had a "huge turnaround" with his behavior, he no longer required medication, and he was not in mental health treatment as of the date of the termination hearing. *Id.* at 28-29, 31-32, 50-51. Child's educational performance had also undergone a significant improvement as he had gone from receiving Cs and Ds to being on the honor roll. *Id.* at 29, 31, 51. Child also articulated his desire to be adopted to his case manager and counsel, he expressed pride in how well he was doing in his pre-adoptive kinship home, and he stated that he did not want to have any future contact with either of his biological parents. *Id.* at 31, 62-63.

In light of the above evidence, we conclude that the trial court did not abuse its discretion in finding that termination of parental rights was appropriate under Section 2511(b). Father's second issue therefore affords no basis for relief.

We now turn to Father's final claim on appeal, in which he challenges the change of Child's permanent placement goal from reunification to adoption. Given our decision to affirm the trial court's termination decrees, any challenge to the goal change order is moot. *See A.H.*, 247 A.3d at 446 ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption."); *see also Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa.

Super. 2020). We therefore dismiss Father's appeal of the goal change order as moot.

Based on the foregoing analysis, we discern no abuse of discretion or error of law in the trial court's involuntary termination of Father's parental rights to Child, and we affirm the lower court's December 8, 2022 decree. Because any challenge to the change of Child's permanent placement goals is moot given our decision to affirm the termination decree, we dismiss the appeal from the December 8, 2022 goal change order.

Decree terminating Father's parental rights affirmed. Appeal from goal change order dismissed.

Judge Kunselman joins the Memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/1/2023</u>